**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**LAREDO DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| WESTWIND MANOR RESORT ASSOCIATION, INC., *et al.*,[1] | Case No. 19-50026 (___) |
| Debtors. | Joint Administration Requested |

**DECLARATION OF JEREMY ROSENTHAL IN SUPPORT OF**
**DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY RELIEF**

I, Jeremy Rosenthal, pursuant to section 1746 of title 28 of the United States Code, hereby declare that the following is true to the best of my knowledge, information and belief:

1.      I am the Chief Restructuring Officer of Warrior Custom Golf, Inc. ("Warrior Custom Golf"), Warrior Acquisitions LLC ("Warrior Acquisitions") and Westwind Manor Resort Association Inc. ("Westwind") (collectively, the "Lead Debtors"). In that capacity, I oversee the financial management of Warrior Custom Golf, Warrior Acquisitions and the affiliated entities managed by Warrior Acquisitions that are also debtors in the above-captioned chapter 11 cases (together with Warrior Custom Golf and Warrior Acquisitions, the "Debtors"). An organizational chart of the Debtors (the "Organizational Chart") is attached hereto as Exhibit A.

2.      I submit this declaration (this "Declaration") in support of the Debtors' voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") and the various motions filed on the date hereof (the "Petition Date") seeking various

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Westwind Manor Resort Association, Inc. (7533); Warrior ATV Golf, LLC (3420); Warrior Acquisitions, LLC (9919); Warrior Golf Development, LLC (5741); Warrior Golf Management, LLC (7882); Warrior Golf Assets LLC (1639); Warrior Golf Venture, LLC (7752); Warrior Premium Properties, LLC (0220); Warrior Golf, LLC (4207); and Warrior Custom Golf, Inc. (2941). The address of the Debtors' corporate headquarters is 15 Mason, Suite A, Irvine, California 92618.

types of "first day" relief (collectively the "First Day Motions").  The First Day Motions seek relief to allow the Debtors to meet necessary obligations and fulfill their duties as debtors-in-possession and minimize the adverse effects of the chapter 11 filings on their businesses.  I am familiar with the contents of each First Day Motion and believe the relief sought therein is (i) necessary to enable the Debtors to operate their businesses during the pendency of these cases (the "Chapter 11 Cases") with minimal disruption or loss of productivity and value, (ii) are critical to achieving a successful restructuring of the Debtors' financial affairs, and (iii) are in the best interests of the Debtors, their estates and all stakeholders.  The facts set forth in each of the First Day Motions are incorporated herein by reference.

3.      I, along with my firm, Force Ten Partners, LLC ("Force 10") have been the financial advisor for the Debtors since February 18, 2019 and the Chief Restructuring Officer of the Lead Debtors since March 3, 2019. I am not a member of the board of directors of any of the Debtors and I am not an owner of any of the Debtors.  I am a partner with Force 10.  Before joining Force 10, I practiced law in the areas of bankruptcy and financial restructuring for over 16 years and have represented debtors, creditors and other parties-in-interest in bankruptcy cases. I have considerable experience and knowledge of the business and legal issues surrounding insolvency, reorganizations, liquidations, and related matters, including investigating the circumstances contributing to a debtor's financial distress.

4.      Since my appointment as Chief Restructuring Officer of the Lead Debtors, I have attempted to become familiar with the Debtors' day-to-day operations, books and records and financial affairs.  In view of my recent appointment, my investigation of the Debtors' operational history, current business activities, capital structure and organizational documents is ongoing and my knowledge and understanding of those areas is evolving.  Except as otherwise indicated, the

2

facts set forth in this Declaration are based on:  (a) personal knowledge of the Debtors'
businesses, employees, operations, and finances that I have obtained in my short time as first
financial advisor and then Chief Restructuring Officer; (b) information learned from my review
of relevant documents; (c) my discussions with members of the Debtors' senior management and
other professionals; (d) information provided to me by Force 10 personnel working under my
supervision; and (e) or my opinion based upon experience, knowledge, and information
concerning the Debtors' operations and financial condition.  If called upon to testify, I would
testify competently to the facts set forth in this Declaration and the First Day Motions.  I am
authorized to submit this Declaration on the Debtors' behalf.

5.      This Declaration is intended to provide a summary overview of the Debtors'
businesses and the need for their restructuring under chapter 11 of the Bankruptcy Code.  The
Declaration has been organized into five sections.  Section one provides an overview of the
Debtors' business.  Section two describes the ownership of the Debtors.  Section three describes
the Debtors' pre-petition capital structure.  Section four describes the events leading to the filing
of the Chapter 11 Cases and objectives of the cases.  Finally, section five describes the relief
requested in the First Day Motions and the basis for that requested relief.

## I.      The Debtors' Business

A.      General Overview of the Debtors' Business

6.      The Debtors operate two (2) distinct business segments.  Warrior Custom Golf
focuses on the manufacture and sale of custom golf clubs.  Warrior Acquisitions manages
affiliates, like Warrior Golf, LLC ("Warrior Golf"), that own and manage golf courses.  Warrior
Custom Golf was founded in 1998 by Brendan Flaherty ("Flaherty").  It develops, manufactures
markets and sells affordable custom golf clubs and related equipment to golfers worldwide.
Warrior Custom Golf's products are custom built to the specifications of each customer.

3

Potential customers are generally identified through direct response advertising, including television and direct mail advertising.   Warrior Custom Golf also identifies customers and sells its products through its website, www.warriorcustomgolf.com.

7.      The second business segment revolves around Warrior Acquisitions.   Warrior Acquisitions is the manager of six (6) entities that own and operate 18 golf courses and parcels of land located throughout the United States.   Warrior Acquisitions' courses (i.e. those under its indirect management) serve their local communities and are located in secondary and tertiary markets.

8.      Both segments of the business are headquartered in Irvine, California.   Warrior Custom Golf employs approximately 70 individuals, including a team of master golf club builders, customer service representatives and sales personnel.   Since the inception of its business, Warrior Custom Golf has generated over $270 million in sales to approximately 1.3 million customers.   Warrior Custom Golf's revenue has fluctuated significantly over the past several years, but it generally has annual revenue of over $15 million.

9.      Warrior Acquisitions employs approximately 270 individuals, including course general managers, food and beverage staff, retail sales staff, grounds keepers and golf instructors.  Warrior Acquisitions' managed courses generated approximately 267,500 rounds of golf in 2018.   Its 18 courses are located throughout California, Florida, Colorado, Iowa, Alabama, North Carolina, South Carolina, Tennessee and Georgia.   At one point the Warrior enterprise owned and managed 22 courses.   Many of the golf courses have additional amenities including golf pro shops, driving ranges, clubhouses, restaurants, bars, swimming pools, private villas and banquet facilities.   Warrior Acquisitions' managed courses generated approximately

4

$13 million in annual revenue over the past few years but generated an operating loss of approximately $680,000 in 2018.

## II.     The Debtors' Corporate Structure

A.     The Custom Club Entities.

10.     As set forth above, Warrior Custom Golf owns and operates the Debtors' custom golf club business.  Warrior Custom Golf, a California corporation, is owned by 100% by Flaherty . Before the Petition Date, Flaherty and Henry Wheelahan (a former equity holder) also served as the sole members of Warrior Custom Golf's board of directors.  In contemplation of the filing of the Chapter 11 Cases, however, the board of directors of Warrior Custom Golf was reconstituted with three (3) independent directors –Russell F. Nelms (ret.), as Chairman, Kevin Lantry and David Gordon.

B.     The Golf Course Entities

11.     Warrior Acquisitions manages six (6) limited liability companies that in turn own eighteen (18) golf courses and golf tracts.  The sole member of Warrior Acquisitions is Flaherty. Before the Petition Date, Flaherty also was the sole member of the board of managers of Warrior Acquisitions.   In contemplation of the filing of the Chapter 11 cases, however, Flaherty appointed three (3) independent managers – Russell F. Nelms (ret.), Kevin Lantry and David Gordon – to serve as the board of managers of Warrior Acquisitions.

12.     Warrior Golf, a Delaware limited liability company, is owned by Flaherty (99%) and Warrior Custom Golf (1%).  As of the Petition Date, Warrior Golf owns the following ten (10) golf courses: (i) Reems Creek Golf Club in Weaverville, North Carolina; (ii) Heddles Hideaway Golf Club in Spartanburg, South Carolina; (iii) Cimarron Golf Resort in Cathedral City, California; (iv) Royal St. Augustine Golf Club in St. Augustine, Florida; (v) Asheboro Country Club in Asheboro, North Carolina; (vi) Whispering Woods Golf Club in Whispering

5

Pines, North Carolina; (vii) Baneberry Golf and Country Club in Baneberry, Tennessee; (viii) Wolf Creek Golf Course in Atlanta, Georgia; (ix) King's Creek Golf Club in Springhill, Tennessee; and (x) Ole Still Golf Club in Hickory, North Carolina.  Warrior Golf also holds a note in the amount of approximately $400,000 related to the sale of its Nocona Hills Golf Club in Nocona, Texas.

13.     The remaining eight (8) properties are owned as follows: Warrior Acquisitions owns Marion Oaks Golf Club and Huntington Golf Club in Ocala, Florida; Warrior Golf Venture, LLC ("Warrior Golf Venture") owns The Club at Rio Vista in Rio Vista, California and has a 99-year lease on Bos Landen Golf Club in Pella, Iowa; Warrior Golf Management LLC ("Warrior Golf Management") owns Boardmoor Golf Links in Fletcher, North Carolina; Warrior Golf Assets LLC ("Warrior Golf Assets") owns Lakota Canyon Ranch Golf Club in New Castle, Colorado and holds a note on the sale of the Lakota Recreation Center in the original principal amount of $1,650,000; Warrior Premium Properties LLC ("Warrior Premium Properties") owns Limestone Springs Golf Club in Oneonta, Alabama; and Warrior ATV Golf LLC ("Warrior ATV Golf") owns vacant land in Moreno Valley, California, each a California limited liability company and collectively referred to herein as "Residual LLCs" and each of their courses is collectively referred to as the "Residual Courses".

14.     As part of the 2017 restructuring described in more detail below, the parties intended to have the Residual LLCs transfer the Residual Courses to Warrior Golf in exchange for a ratable portion of a note related to the ascribed value of each Residual Course.  This portion of the 2017 restructuring was not fully consummated.  As a result, the Residual LLC's continue to retain the Residual Courses.  Further complicating matter, although the Residual LLC's never transferred the Residual Courses, certain of the Residual LLCs, namely: Warrior Golf

Development, Warrior Golf Venture LLC, Warrior Premium Properties and Warrior ATV Golf (collectively, the "Dissolved Debtors") purported to dissolve under California law while they still owned their courses. Each of the Dissolved Debtors filed both Certificates of Dissolution and Certificates of Cancellation under California law.

15.     I have been informed by counsel to the Debtors that Section 17707.06 of the California Corporate Code entitled "Continuation of limited liability company for specified purposes" provides as follows:

> A limited liability company that has filed a certificate of cancellation nevertheless continues to exist for the purpose of winding up its affairs, prosecuting and defending actions by or against it in order to collect and discharge obligations, disposing of and conveying its property, and collecting and dividing its assets. A limited liability company shall not continue business except so far as necessary for its winding up. A limited liability company that has filed a certificate of cancellation nevertheless continues to exist for the purpose of winding up its affairs, prosecuting and defending actions by or against it in order to collect and discharge obligations, disposing of and conveying its property, and collecting and dividing its assets. A limited liability company shall not continue business except so far as necessary for its winding up. A limited liability company that has filed a certificate of cancellation nevertheless continues to exist for the purpose of winding up its affairs, prosecuting and defending actions by or against it in order to collect and discharge obligations, disposing of and conveying its property, and collecting and dividing its assets. A limited liability company shall not continue business except so far as necessary for its winding up.

16.     To effectuate the "winding up" of their affairs, including potentially prosecuting and defending actions, disposing and conveying property, and collecting and dividing assets (including estate owned causes of action), I have caused the Dissolved Debtors to seek the protection of this Court. Toward that end, the Residual LLCs (including the Dissolved Debtors) may seek to effectuate the transfer of the Residual Courses to Warrior Golf as contemplated by the parties to the 2017 restructuring for the purpose of effecting an equitable distribution of the

value of all of the golf courses to holders of allowed claims.  If the Debtors ultimately seek such authority from the Court, then they will file the appropriate noticed motion(s) with the Court in the future.

C.      Westwind Entity

        17.     Westwind, a Texas corporation, was created to serve as the timesharing association for the development known as Westwind Manor in Runaway Bay, Texas.  The sole shareholder of Westwind is Warrior Acquisitions.  Before the Petition Date, Flaherty, Aaron Mun, Walter Bolen and Wheelahan were the members of the board of directors of Westwind.  In contemplation of the filing of the Chapter 11 cases, however, Flaherty appointed three (3) independent directors –Russell F. Nelms (ret.), Kevin Lantry and David Gordon – to serve as the board of directors for Westwind.   As of the Petition Date, Westwind may still own certain time share real property interests in Texas.

D.      The 2017 Restructuring Transactions

        18.     The genesis of the Warrior golf course ownership and management business dates back to approximately 2005, when various Warrior entities decided to raise money from investors for the purchase of golf courses.  They marketed the investment opportunity to the customers of Warrior Custom Golf through various private placement memoranda.  From 2005 to 2014, they raised over $100 million from approximately 2,200 different investors by selling interests in twelve (12) limited liability companies (the "Original LLCs"), each formed to acquire and manage one or more golf courses.  Those investments were memorialized by Subscription Agreements.  Based on information conveyed to me by the Debtors, (i) roughly 75% of the money raised from investors was used to fund the acquisition of twenty-two (22) golf courses (the "Golf Courses"), and (ii) the balance of the investment dollars were used in accordance with the Subscription Agreements to pay fees and expenses in connection with the equity raise and to

8

fund administrative and operational expenses, and working capital needs at each LLC's own Golf Courses and potentially at other Golf Courses.

19.     The golf course ownership and management business generally operated at a loss and ultimately experienced severe liquidity constraints.  In 2016, Flaherty was physically absent from the Debtors while he recovered from serious health issues.  It is my understanding that the golf course business suffered in Flaherty's absence.  Upon returning to work, Flaherty was faced with the daunting task of managing two (2) distressed businesses and attending to his health. Given the state of disarray of the Debtors' custom club business and golf course business as well as the marked decline in general golf industry conditions and course values during that same time period, in or about August 2017, the Warrior entities implemented a plan designed to recognize the decline in real estate value of the golf courses and, contemporaneously, consolidate and simplify the capital structure.

20.     Based on information conveyed to me by the Debtors, Warrior's objective was to convert the more than $100 million of equity investments in the LLCs to $40 million of promissory notes to be issued by Warrior Golf as the intended purchaser of the Golf Courses. The $40 million of promissory notes were guaranteed by Warrior Custom Golf.  The apparent plan was for each of the LLCs to transfer its assets to Warrior Golf in exchange for a ratable portion of the $40 million promissory note "Note") that would be fractionalized and delivered ratably to the underlying investors in each LLC.  The $40 million exchange price for the Golf Courses was determined based upon a presentation by Marcus & Millichap[2] that estimated the value of the Golf Courses and other real estate assets owned by the LLCs at approximately $33 million.  A twenty percent (20%) mark-up was then placed on the estimated value of the real

[2] The Marcus & Millichap presentation included indications of value for the Debtors' golf course and related assets, but was not a formal appraisal.

property giving rise to $40 million of Notes.  After the transfer of each LLC's assets to Warrior

Golf in exchange for a portion of the Notes, the restructuring contemplated that each LLC would

*first* "cancel" their fractional Note, *second* distribute *pro rata* interests in the (canceled) Note to

its members in the form of Pro Rata Promissory Notes in an amount equal to each member's

percentage equity in each LLC multiplied by the value of the LLC's assets as indicated in the

Marcus & Millichamp materials, and *third* each LLC would then dissolve.  In actuality, (i) each

LLC (other than the Residual LLCs) transferred its assets to Warrior Golf, (ii) each LLC

received its fractional Note, (iii) each LLC transferred fractional Pro Rata Promissory Notes to

its members, and (iv) then various LLCs dissolved, including the Dissolved Debtors even though

the Dissolved Debtors continued to hold title to their real property assets.[3]

### III.    **The Debtors' Capital Structure**[4]

A.    <u>Warrior Custom Golf</u>

21.    Warrior Custom Golf does not have any funded secured debt obligations.  Warrior

Custom Golf utilizes a broad range of vendors to provide materials to manufacture golf clubs and

otherwise operate its manufacturing business.  Based on results of initial lien searches, Warrior

Custom Golf may have financed certain equipment that is secured by a lien on that equipment.

As of the Petition Date, the Warrior Custom Golf's aggregate accounts payable to vendors is

approximately $630,000.

22.    Warrior Custom Golf is a guarantor of the $40 million of Pro Rata Promissory

Notes.  It appears that based on its status as a guarantor of the Pro Rata Promissory Notes a

---

[3] It appears that from November 2018 through January 2019, the Debtors tried to record deeds transferring certain properties to Warrior Golf.  Those deeds, however, were returned as being defective and were never corrected.

[4] The Debtors do not concede that any liens (contractual, common law, statutory or otherwise) described in this Declaration are valid, and the Debtors expressly reserve the right to contest the extent, validity, priority, perfection, or possible avoidance of all alleged liens.

40000/0462-16973687v8

default judgment in the amount of $1.3 million in favor of Cecil Mellinger was entered in Florida against Warrior Custom Golf on December 19, 2018 (the "Default Judgment").  Additionally, Warrior Custom Golf is an obligor on three (3) Lump Sum Payment Promissory Notes in favor of Anthony Ivankovich in the aggregate principal amount of $2 million.

B.      Golf Course Business

        23.     The majority of the Debtors' golf courses are unencumbered.  Six (6) of the golf courses, however, are encumbered with consensual liens and/or an assignment of rents as follows:

| Property/ Debtors | Lender | Principal | Security/Collateral | Balance |
|---|---|---|---|---|
| Broadmoor Golf Links<br><br>(Warrior Golf Management, LLC) | Broadmoor Group, Inc., Albert Ronald Smoak and Zoe Anne Smoak | $2,000,000 | i)     Deed of Trust | $1,300,000 |
| Cimarron Golf Resort<br><br>(Warrior Golf Equities, LLC and Warrior Golf LLC, as borrowers, Warrior Acquisitions, LLC, as guarantor) | Citizen Business Bank | $2,000,000 | i)     Deed of Trust, Assignment of Rents and Hazardous Substances Certificate and Indemnity Agreement;<br><br>ii)    All personal property including but not limited to all equipment, fixtures and other articles of personal property owned by Debtor or attached/affixed to the property located at 67603 30th Ave., Cathedral City, CA 92334; all records of any kind relating to any of the foregoing." as to Warrior Golf, LLC. | $2,000,000 |
| Lakota Canyon Ranch Golf Club<br><br>(Warrior Golf Assets, LLC, Warrior Acquisitions) | ANB Bank | $1,500,000 | i)     Deed of Trust, concerning vacant land, New Castle, Co. 81647<br><br>ii)    Deed of Trust, concerning 1000 Clubhouse Dr., New Castle, CO 81647<br><br>iii)   Collateral Assignment, concerning Colorado River Water Supply Contract No. CW03003, as amended<br><br>iv)    All goods now or in the future | $1,500,000 |

11

| | | | affixed or attached to real estate. | |
|---|---|---|---|---|
| Huntington Golf Club[5]<br><br>Marion Oaks Golf Club<br><br>(Warrior Acquisitions, LLC) | Marion Oaks Country Club Inc. | $625,000 for each property | i)    Mortgage Deed | $509,906 for each |

24.     Additionally, based on results of initial lien searches, certain parties have purportedly filed general liens against the Debtors relating to the finance of equipment, leases of equipment and operations of the golf course management business.

25.     The balance of the debt owed in connection with the golf course ownership and management business is unsecured.  As of the Petition Date, the aggregate accounts payable to vendors is approximately $1,390,000.   Additionally, Warrior Golf is the borrower under the $40 million of Pro Rata Promissory Notes and is also subject to the Default Judgment.

26.     Finally, in 2016 and 2017, Warrior Acquisitions raised an additional $5.5 million from investors through the issuance of Convertible Promissory Notes (the "Convertible Notes"). The capital raised through the issuance of the Convertible Notes initially was intended to fund efforts to become a publicly traded company.  Those efforts, however, were abandoned in 2017. As of the Petition Date, $5.5 million remains outstanding on the Convertible Notes.   The Convertible Notes provide that they are convertible into equity of Warrior Acquisition LLC or its successor in April 2019.   Warrior Acquisition LLC is evaluating the ramifications of this conversion feature.

---

[5] While the Debtors are unable to locate copies of the Huntington Golf Club loan or lien documents, upon information and belief, the form of such documents are substantially similar to those for Marion Oaks Golf Club.

**IV.**    **Events Leading to Chapter 11 Cases and Need for Relief**

27.    The Debtors, like many other entities in the golf industry, have faced a challenging environment over the last several years.  In general, there has been a nationwide downturn in the golf industry caused by, among other things, an overall decline in the number of players, an increase in cost of water and labor to operate golf courses, an overabundance of golf courses, escalating labor costs and the increasing price of equipment.  Complicating matters further, poor weather across the United States in 2018 and the beginning of 2019 resulted in significantly fewer rounds of golf played and ultimately the closure of significant portions of the Debtors' most profitable golf course, Cimarron Golf Resort, at its most profitable time of the year due to flooding.  Those external factors, coupled with Debtors' obligations under its debt instruments, contributed to the Debtors' overall liquidity constraints.

28.    In addition, the Debtors have been negatively impacted by a lack of management depth and professional financial support.  The Debtors, operating without a financial officer, lacked financial controls and the ability to recognize and mitigate their economic distress.  As a result, the Debtors were unable to meet certain of their imminent expenses.  For example, Warrior Golf failed to make a $500,000, semi-annual interest payment on March 1, 2019 on account of the Pro Rata Promissory Notes and simply does not have the liquidity to honor its obligations under those notes.

29.    Further contributing to the urgency of the Chapter 11 Cases is the entry of the Default Judgment against Warrior Custom Golf and Warrior Golf.  The Twelfth Judicial Circuit Court in and for Manatee County, Florida required Warrior Custom Golf, Warrior Acquisitions and Warrior Golf to post collateral in the aggregate amount of $1.3 million by March 4, 2019 to allow a stay of the execution of the Default Judgment while Warrior Custom Golf, Warrior Acquisitions and Warrior Golf pursue a vacatur of the judgment.  The Debtors lacked sufficient

13

funds to post the full amount of $1.3 million while they challenge the default judgment and, thus, the appropriate option was to file bankruptcy to prevent further execution on the Default Judgment, preserve their businesses as a going concern and avoid the preferential judgment lien filed against the Royal St. Augustine Golf Club in St. Augustine, Florida, owned by Warrior Golf.

30.     These Chapter 11 cases will provide the Debtors with access to funds through debtor in possession financing so that they can maximize value of their assets while seeking to reorganize their businesses.  The Debtors intend to stabilize their operations, pursue initiatives to rationalize business expenses, conduct a forensic analyses of the Debtors' historical financial transactions and maximize the value of both the golf course business and the custom club business for the benefit of all stakeholders.

## V.     First Day Motions[6]

31.     Contemporaneously with the filing of their chapter 11 petitions, the Debtors have filed the First Day Motions seeking relief that is necessary to enable them to transition smoothly into chapter 11 and to minimize disruptions to their business operations.  I respectfully submit that the relief requested in each First Day Motion should be granted because such relief is critical to stabilize and facilitate the Debtors' operations during the pendency of the Chapter 11 Cases. A summary of the relief requested in each First Day Motion is provided below.

32.     I have reviewed each of the First Day Motions and confirm that all the facts set forth therein are true and correct to the best of my knowledge and belief, based upon my personal knowledge of the Debtors' businesses, employees, operations, and finances; information obtained from my review of relevant documents; my discussions with members of the Debtors'

---

[6] Capitalized terms used but not defined in this section of this Declaration shall have the respective meanings ascribed to those terms in the relevant First Day Motion.

40000/0462-16973687v8

senior management and advisors; information provided to me by Force 10 personnel working under my supervisions; or my opinion based upon experience, knowledge, and information concerning the Debtors' businesses.

A.     Administrative and Procedural Motions

33.     <u>Joint Administration Motion</u>.  I believe the joint administration of these cases will avoid the unnecessary time and expense of duplicative motions, applications, orders and other pleadings and related notices that otherwise would need to be filed in each separate case.  I believe that joint administration also will save considerable time and expense for the Debtors, the Clerk of the Court, the U.S. Trustee and other parties in interest, which, in turn, will result in substantial savings for the Debtors' estates.  I do not believe that the rights of the Debtors' creditors will be adversely affected by joint administration of the Chapter 11 Cases.

34.     <u>Application to Appoint Claims and Noticing Agent.</u>  The retention of Donlin Recano is the most effective and efficient manner of noticing creditors and parties in interest of the filing of the Chapter 11 Cases and of other developments in the Chapter 11 Cases.  I am informed that Donlin Recano has acted as the claims and noticing agent in numerous cases of comparable size.  Donlin Recano's retention to act as an agent of the Court, as an independent third party with significant experience in this role, is in the best interests of the Debtors as well as their estates and creditors.

35.     <u>Motion to Extend Time to File Schedules and Consolidate Creditors</u>.  Due to the (a) size and scope of the Debtors' business, (b) the complexity of their financial affairs, (c) the limited staffing available to perform the required internal review of their accounts and affairs and (d) the Debtors' focus of their attention on initial bankruptcy filing matters, the Debtors will not be able to assemble the information necessary to complete and file the schedules and statements of financial affairs by the applicable deadline.

40000/0462-16973687v8

36.     The Debtors, while separate legal entities, have a large number of common creditors and a centralized cash management system.  Filing separate Top 20 Lists and separate creditor matrices in their respective cases would generate a variety of lists with a large number of duplicate entries.  Consolidating the list of creditors is in the best interests of the Debtors, their estates and creditors to avoid unnecessary duplication and to ensure administrative efficiency.

B.      Operational Motions

37.     Motion to Provide Adequate Assurance for Utilities.  In order to operate their businesses, the Debtors rely on various utility services throughout the country.  Uninterrupted utility services are essential to the Debtors' continued operations.  Should any Utility Company alter, refuse or discontinue service, even for a brief period, the Debtors' business operations could be severely disrupted and the value of their golf courses could be severely damaged, jeopardizing the Debtors' reorganization efforts.  It is, therefore, essential that the Utility Services continue uninterrupted.

38.     On average, before the Petition Date, the Debtors spent approximately $113,000 each month on account of Utility Services.  I believe that the Debtors' monthly utility costs going forward will be substantially similar for the Chapter 11 Cases.  The Debtors have proposed to deposit $57,000 in a segregated account, which represents an amount equal to approximately one half of the Debtors' average monthly cost of Utility Services, calculated based on the Debtors' average utility expenses during the 2018 calendar year, net of any prepetition deposits, letters of credit, or surety bonds provided to the Utility Companies in the ordinary course, if any.

39.     Motion for DIP Financing.  Before the Petition Date, the Debtors conduced a search to identify potential lenders to provide DIP Financing to the Debtors.  Force 10 reached out to over 10 potential DIP lenders that might be interested in providing DIP Financing of between $1.5 million and $5 million and I had lengthy calls with five interested potential DIP

16

lenders to discuss the Debtors' needs, anticipated timing for a chapter 11 filing, the Debtors' business operations and their asset base.  After this search, the Debtors concluded that no other party could provide financing on more favorable terms than those provided by Warrior Golf Loan Investors, LLC (the "DIP Lender").  Notwithstanding the name of this newly created entity, I am not aware of any prior relationship between the DIP Lender and the Debtors or Flaherty.  The DIP Financing provides the Debtors with access to up to $2.5 million on the terms set forth in the DIP Credit Agreement.

40.     The Debtors require immediate access to liquidity to ensure that they are able to continue operating during these chapter 11 cases and preserve the value of their estates for the benefit of all parties in interest. As of the Petition Date, the Debtors' total cash available is insufficient to operate their businesses and continue paying their debts as they come due. Without prompt access to postpetition financing, the Debtors will be unable to pay wages for their employees, pay vendors to supply necessary goods and services, preserve and maximize the value of their estates, and administer these chapter 11 cases, causing immediate and irreparable harm to the value of the Debtors' estates to the detriment of all stakeholders.

41.     Motion to Continue Cash Management System.  The Debtors have filed a motion to continue their ordinary course banking practices.  I understand that the Debtors maintain a cash management system, comprised of 74 bank accounts.  Continued use of the Bank Accounts facilitates the efficient flow and management of funds involved in the Debtors' operations. Maintaining the Cash Management System is in the best interest of the Debtors and their estates.

42.     In the ordinary course of business, the Debtors may use a number of checks, business letterhead, purchase orders, invoices, envelopes, promotional materials and other business forms and correspondence (collectively, the "Business Forms").  Given that the

Business Forms were used prepetition, they do not include references to the Debtors' current status as debtors-in-possession.  Most parties doing business with the debtors will be aware of the Debtors' status as debtors-in-possession.  As is the case with the existing Cash Managements System, requiring the Debtors to change existing Business Forms would unnecessarily distract the Debtors from their restructuring efforts and impose needless expenses on the estate, without any meaningful corresponding benefit.

43.    <u>Motion to Pay Prepetition Employee Wages</u>.  Warrior Custom Golf employs approximately 110 individuals including a team of master golf club builders, customer service representatives and telemarketing personnel.  Warrior Acquisitions employs approximately 270 individuals located in approximately 10 states related to the operations and management of the Debtors' golf courses.  Warrior Custom Golf Employees are paid wages, salaries, and other compensation on a weekly basis.  Warrior Acquisitions Employees are paid wages, salaries, and other compensation on a bi-weekly basis.  As of the Petition Date, the Debtors estimate they owe approximately $275,000 to Employees on account of all accrued but unpaid wages, salaries, overtime, and other compensation earned before the Petition Date and such amount will be due to employees on Friday, March 8, 2019.  In addition to wages, the Debtors offer an employee benefits package to eligible Employees for medical, dental, and vision care coverage and certain other benefits.

44.    Employees will be exposed to significant financial difficulties if the Debtors are not permitted to honor obligations for unpaid Employee Compensation and Benefits.  Additionally, continuing ordinary course benefits will help maintain Employee morale and minimize the adverse effect of the commencement of these chapter 11 cases on the Debtors' ongoing business operations.

45.     <u>Motion to Honor Customer Programs</u>.  Prior to the Petition Date, and in the ordinary course of their business, the Debtors engaged in a variety of marketing and sales practices designed to develop and sustain customer satisfaction and loyalty (collectively, the "<u>Customer Programs</u>").  The Customer Programs include, without limitation, Gift Cards, Memberships, Refund Programs, Reward Cards, and Pre-Paid Rounds of Golf.  The goal of the Customer Programs is to meet competitive pressures, ensure customer satisfaction and generate goodwill for the Debtors, thereby retaining current customers, attracting new customers, and ultimately enhancing loyalty and sales among the Debtors' existing customer base.

46.     Authorizing the Debtors to pay prepetition amounts due on account of, and honor prepetition commitments pursuant to, the Customer Programs will allow the Debtors' operations to continue without interruption during the pendency of these chapter 11 cases.  The Debtors' failure to honor the Customer Programs likely would lead to the loss of customer satisfaction, resulting in reduced future sales, deterioration of goodwill, and irreparable harm to the Debtors' online reputation and their businesses and revenues more generally.

47.     Accordingly, I believe that the relief requested therein is in the best interests of the Debtors, their estates, and creditors and should be approved.

## VI.     <u>Conclusion</u>

48.     This Declaration describes the factors that have precipitated the commencement of the Chapter 11 Cases and demonstrates the need for the Debtors to obtain the relief requested in the First Day Motions.

49.     Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that, to the best of my knowledge and after reasonable inquiry, the foregoing is true and correct.

Dated: March 4, 2019
          Irvine, California


                                        /s/ Jeremy Rosenthal
                                Name: Jeremy Rosenthal
                                Title:   Chief Restructuring Officer

# EXHIBIT A

# OPERATIONAL ORGANIZATIONAL CHART



16989413.5